IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| CAPITAL CONCRETE CO., Plaintiff, v. GLENN KEITH PAULOS, JR., ANTHONY DUSTIN CROFT, DONNA G. ROLLINS AND CORE CONCRETE, LLC, Defendants. | CIVIL ACTION NO.: 3:25-cv-04058-MGL **VERIFIED COMPLAINT AND REQUEST FOR PRELIMINARY INJUNCTION** **(NON-JURY)** |

This is an action for preliminary injunctive relief, damages, and for a permanent injunction. The Plaintiff, Capital Concrete ("Capital") complaining of the acts of the Defendants, alleges and states that:

**INTRODUCTION**

The concrete supply industry in the Midlands of South Carolina ("territory") is highly competitive and there are approximately five companies that bid, or are in consideration for, most residential and commercial concrete projects in the territory. These companies that compete with one another service the entire territory in Richland, Lexington, Calhoun, and Kershaw counties. Plaintiff Capital Concrete ("Capital" and/or "Company") is one of the largest concrete suppliers in the Midlands territories and has had a longstanding and unbending corporate policy to have certain high-level and/or management-level employees sign written agreements to protect and restrict the employee's use and misuse of Capital's confidential, trade secret, and proprietary customer, vendor, pricing and corporate business plan information and documents in the event the employee separates from the Company. Additionally, in order to protect its proprietary information and documents and to ensure that there will be no unfair competition, certain employees, who receive sufficient consideration, sign written agreements that would prevent the employee from

working with a competitor in the prohibited territories for two years after they separate from the Company, whether such separation is voluntary or involuntary.

The Defendants herein have engaged in activities which directly violate and breach the agreements signed by Defendants Keith Paulos and Donna Rollins and have used Capital Concrete's proprietary information and documents to unfairly compete against Capital Concrete. Defendant Core Concrete has engaged in a pattern of corporate piracy in hiring Capital Concrete's former director of sales and a former administrative employee in order to have these individuals transfer this protected information and customer base to Core Concrete. Prior to his employment ending, Defendant Paulos deceitfully downloaded and misappropriated Capital Concrete's crucial and vital customer and product pricing information for his own use. In addition, he deleted all information belonging to Capital from his company-issued phone. Both former employees falsely told Capital Concrete prior to their separations that they would be taking jobs that would not compete with Capital Concrete and would not be in violation of their signed agreements. These representations were blatantly false. Such actions are not above-board competitive activities that the law supports but are unlawful and interfere with Capital Concrete's rights and ongoing business operations and constitute prohibited unfair competition.

**JURISDICTION AND VENUE**

1. Capital is a corporation authorized to do business in South Carolina with its principal place of business in Lexington County, South Carolina.

2. Core Concrete's principal place of business is Kershaw County, South Carolina. Keith Paulos ("Paulos") is a citizen and resident of Lexington County, South Carolina. Dustin Croft ("Croft") is a resident of Lexington County, South Carolina. Donna Rollins ("Rollins") is a resident of Kershaw County, South Carolina

3. Jurisdiction and Venue are proper in this federal judicial district as the matter concerns a federal statute, so jurisdiction is pursuant to 28 USC § 1331 and Venue is proper in this judicial district and division pursuant to 28 USC § 1391.

**ALLEGATIONS APPLICABLE TO ALL CAUSES OF ACTION**

4. Capital provides concrete and related services to a variety of businesses in Newberry, Richland, Lexington, Saluda, Edgefield, Aiken, Fairfield, Orangeburg, and Calhoun counties in South Carolina. Using information and contacts that Capital has developed over time, Capital solicits businesses to provide concrete, concrete delivery, and related services. The prices, types, and formulation of the concrete mixes vary by customer and/or project pursuant to the customer's preferences, consequently this information is not known outside Capital. This information and related documents are proprietary, confidential and constitute trade secrets. Additionally, Capital has expended significant resources to develop and maintain its customer and potential customer contact lists, along with extensive proprietary product testing to ensure its concrete mixtures are of the highest possible standards. The identities of Capital's customers, products provided, and its pricing strategies are extremely valuable assets which Capital has routinely taken steps to protect.

5. Defendant Core offers similar products and/or services that are similar to the products and/or services offered by Capital. It offers these products and services in the same territorial areas in which Capital operates. In short, Core is a direct competitor of Capital.

6. Capital and its competitors for any given construction project determine the performance and concrete mix criteria for each project, typically dependent on the unique specifications developed by the architectural or engineering firm of record for the particular project. Based on Capital's extensive testing history and the proprietary test results, a product that exceeds the specifications for the project is developed and, based on Capital's negotiated raw material costs from third parties, pricing is developed for the project.

7. At Paulos's separation from Capital in March 2025, he was employed as Director of Sales for Capital, primarily responsible for bidding, pricing jobs and overseeing Capital's sales staff.

8. Croft is either the General Manager or a management level employee for Core.

9. From approximately 2017 through the fall of 2024 Rollins was an office administrator for Capital and maintained customer files and related propriety mix/product designs along with maintenance of customer computer records in Capital's electronic billing system and accordingly had access to all customer sales and product information.

10. Both Paulos and Rollins had unfettered access to Capital's customer and job information, constituting trade secrets, which only a few chosen employees had.

11. Because concrete mix formulations and related pricing are highly unique to each project, and require significant resources to develop, this information is highly confidential and, if a competitor were to gain access to such information, it could easily avoid significant costs and efforts to develop this information. Such information would give a competitor an easy basis on which to divert Capital customers to their own portfolios.

12. Customer lists are considered trade secrets by law and if they are improperly misappropriated, the law presumes irreparable harm will occur.

13. The identity of customers, and the projects in which such customers are engaged cannot be readily ascertained. Pricing and services needed, as well as customer and potential contact information, is not generally known. There are no public or purchasable databases with such information.

14. Instead, this information is developed by the owner and CEO of Capital, John Shealy, Jr. ("Shealy") and additional Capital administrative, sales and marketing employees.

15. Capital maintains this information through industry-specific software platforms for the ready mixed concrete industry; these software applications reside on both an in-house server network as well as some applications being cloud-based. Users with appropriate job duties are authorized via specific user credentials**,** with each user having independent password requirements. Each user's job duty requirements dictate their authorization to various data. As a trusted senior marketing manager, Paulos was allowed the highest level of clearance into Sales, Customer and Product Pricing information.

16. Each member of the Sales-Marketing Department is provided with a company issued laptop/Surface Pro computer for use and portability. These devices are not restricted to office-only use due to the nature of the job duties within the construction sector and the variability of the location of projects.

17. Every individual with access to confidential Sales-Marketing data, and the associated customer files and related pricing information for various products and services is covered by a "*Confidentiality and Non-Solicitation*" agreement. Paulos entered into such agreement on October 23, 2023, in exchange for participation in the Capital Concrete Co. Stock Appreciation Rights ("the SARs program") program and was granted significant consideration in the form of appreciated value of Capital stock.

18. Because of the highly competitive nature of the business, it is essential that Capital guard the entirety of its business contact and customer information.

19. Paulos informed Capital he was voluntarily leaving its employment on March 24, 2025, with an effective exit date of March 31, 2025.

20. He informed Capital that he was going to work for his wife's family's business of clearing and grading construction projects, along with hauling and dump truck transportation, a business that does not compete with Capital's business and with which Shealy had no objection.

21. Rollins informed Capital that she was leaving her employment with Capital on September 4, 2024. During her exit interview with Shealy, she informed Capital that she was going to work for Palmetto Corporation, an asphalt paving contractor, a business that does not compete with Capital's business, and would be working remotely from home, maintaining dump truck vehicle and commercial driver records. Similar to Paulos, Shealy had no objection.

22. After his separation from Capital, Paulos confirmed to an employee for Capital that he had accepted employment working directly for Core in a senior management position directly overseeing Sales-Marketing activity in the markets that Core operates in and directly competes with Capital.

23. In return for being granted Stock Appreciation Rights ("SAR"), Paulos and Rollins agreed to certain restrictions on any employment they might take after the termination of their employment with Capital.

24. The SAR Agreement (**Exhibit A** for Paulos and **Exhibit B** for Rolins) contained certain post-termination restrictions; however, in Paulos' case, he executed a separate *Confidentiality and Non-Solicitation Agreement* ("CNS") (**Exhibit C**), and the post-termination provisions of the CNS supplanted the post-termination provisions of the SAR Agreement. The consideration provided to support the Paulos CNS was the SAR stock rights.

25. In Rollins case, she executed the SAR Agreement in January 2017 and a CNS in September 2020.

26. Paulos and Rollins agreed, through the CNS agreements, that they would not disclose certain confidential information which included customer and project identification and pricing information. They further agreed, for a period of two years following termination of employment, not to solicit, or assist anyone else to solicit, any Capital customer or prospective customer with whom they had material contact in the last year of their employment with Capital.

27. Rollins agreed, on September 8, 2020, through the execution her own CNS, to the same restrictions as did Paulos. (**Exhibit D**). The consideration provided to Rollins was a $4,000.00 cash bonus. As with Paulos, she agreed, for a period of two years following termination of her employment, not to solicit, or assist anyone else, to solicit, any Capital customer or prospective customer with whom she had had material contact in the last year of her employment with Capital.

28. Paulos and Rollins had significant contact with many of Capital's largest customers and are in a position to take these customers from Capital if they are permitted to violate their employment agreements.

29. In fact, Paulos has already solicited and attempted to take some of these customers. Capital has noted an unusual number of clients with whom Paulos had significant contact prior to his separation from Capital that have either not placed new orders or have demanded decreases in prices. One customer specifically mentioned shifting much of their business to Core.

30. From March 6, 2025, through March 24, 2025, Paulos had twenty-nine phone calls with Defendant Croft, General Manager for Core on his Capital company-issued phone.

31. In the weeks prior to Paulos' termination of employment with Capital, he downloaded and stole confidential information from Capital with the intent of using this information in his new employment with Core and did so without telling Capital, getting permission from Capital and without Capital's contemporaneous knowledge.

32. On March 11, 2025, between 7:57am and 9:24am, Paulos created a Word file and drafted a resume and accompanying narrative of work experience to send to Core Concrete and Croft.

33. On March 18, 2025 at 11:22am, Paulos downloaded from *ConcreteGo*, (Capital's confidential dispatch platform), a "Customer Scorecard" report which summarizes various profitability indices for every customer, with various data included, such as cubic yards and customer pricing over what appears to be the past year of activity.

34. Also, on March 18, 2025, at 12:07pm, Paulos saved updates on the *Sales Forecast* template, an Excel spreadsheet that records historical and projected future cubic yards by customer by month.

35. On March 25, 2025, at 11:15am, Paulos again downloaded from *ConcreteGo* a "*Project Detail"* report in Excel and PDF which summarized all projects, including customer information and contact information, and various sensitive information including future price increase amounts and dates.

36. On March 26, 2025, at 10:19am, Paulos again downloaded from *ConcreteGo* a "*Customer*" report in Excel and PDF with summarized all customers, all mix IDs, all prices for each mix as well as additional sensitive and confidential information.

37. On March 26, 2025, at 4:22pm, Paulos again downloaded the *ConcreteGo "Customer Scorecard"* report.

38. On March 27, 2025, at 11:15am, Paulos again downloaded *the ConcreteGo "Project Detail"* report.

39. In early 2025, Rollins contacted Greg H. Howell ("Howell"), who at that time was Midlands South Carolina Division President for United Homes Group, to inquire about the status of payment for an outstanding invoice for work done by Core.

40. During the call, Rollins stated that she represented Core and was inquiring on its behalf.

41. On May 1, 2025, Howell became employed by Capital as its President and COO.

42. Defendants Core, Paulos, and Croft, with knowledge of Paulos's contractual obligations and possession of improperly obtained trade secret and confidential information, allowed Paulos to retain and use this information for the benefit of Core.

43. Defendant Core made offers of employment to the individual Defendants at least in part for the purpose of procuring Capital proprietary customer and project information and did so with the express purpose of using this information to induce Capital customers to stop doing business with Capital and start doing business with Core and to gain economic advantage over Capital because these employees know the secret sauce of Capital's business.

44. Capital advised Shawn–Godwin, CEO of Core, and Core of its rights in the written agreements. Despite this notice, Core still employs Paulos and Rollins and continues to benefit from their use of the stolen information and documents. Thus, Core is working in concert with Croft Rollins and Paulos to raid Capital and such concerted activities have caused irreparable harm to Capital.

**FOR A FIRST CAUSE OF ACTION BY CAPITAL AGAINST PAULOS, CORE, AND CROFT**

**(Violation of the South Carolina Trade Secrets Act, S.C. Code Ann. §§ 39-8-10 *et seq*.)**

45. Capital incorporates by reference each and every allegation contained in paragraphs 1 through 44 of this Complaint.

46. Capital has routinely taken effective steps to maintain and protect the confidentiality of its customers' identities, the details of its business relationships with its customers and its business forms and pricing by having key employees execute written agreements which spell out, in detail, the trade secret information and the prohibited use of that information.

47. The identity of Capital's customers and potential customers, forms, pricing, and the details of its business relationships with its customers are Trade Secrets as that term is defined by S.C. Code Ann. § 39-8-20(5) and by law any misuse will cause irreparable harm.

48. Defendants signed confidentiality agreements which provided that they would not disclose or utilize Capital's confidential information.

49. Defendants knew that Capital considered its customers' identities and the details of its business relationships with its customers to be confidential information.

50. Defendants' use of Capital's confidential information and documents for their benefit and without Capital's permission constitutes misappropriation, as that term is defined in S.C. Code Ann. § 39-8-20(2), of trade secrets in violation of S.C. Code Ann. § 39-8-30.

51. Pursuant to S.C. Code Ann. § 39-8-50, Capital is entitled to an injunction prohibiting the actual or threatened misappropriation of its trade secrets.

52. Capital will be irreparably harmed if Defendants are allowed to continue their scheme to misappropriate Capital's trade secrets.

53. Capital has no adequate remedy at law.

54. The balance of equities is in Capital's favor.

55. The public interest favors enforcing laws protecting trade secrets and preventing unfair competition in the marketplace and trade secret protection serves the public interest and promotes fair competition.

**FOR A SECOND CAUSE OF ACTION BY CAPITAL AGAINST CORE**
**(Tortious Interference with Existing Contractual Relations)**

56. Capital incorporates by reference each and every allegation contained in paragraphs 1 through 55 of this Complaint.

57. Core has tortiously and maliciously interfered with the contractual and business relationships of Capital with its customers and employees.

58. Core, through Croft, had knowledge of the various contracts between Capital and its employees and has intentionally procured the breach of these contracts without justification and procured Capital customers to terminate their contracts.

**FOR A THIRD CAUSE OF ACTION BY CAPITAL AGAINST CORE**
**(Tortious Interference with Prospective Contractual Relations and Economic Advantage)**

59. Capital incorporates by reference each and every allegation contained in paragraphs 1 through 58 of this Complaint.

60. Core has tortiously and maliciously interfered with the prospective contractual, business relationships and economic advantage of Capital with its customers and employees.

61. Core, through Croft, had knowledge of the various prospective contracts between Capital and its customers and employees and has intentionally attempted to divert these business opportunities to itself using Capital's trade secret and confidential information.

**FOR A FOURTH CAUSE OF ACTION BY CAPITAL AGAINST PAULOS AND ROLLINS**
**(Breach of Contract)**

62. Capital incorporates by reference each and every allegation contained in paragraphs 1 through 61 of this Complaint.

63. Paulos' and Rollins' unauthorized disclosures or use of Capital's confidential information breached the confidentiality provisions of the Agreements.

64. Paulos' and Rollins' competition breached the non-competition and non-solicitation provisions of their respective agreements.

40. Capital is entitled to injunctive relief (as provided in the agreements) and damages as a result of these breaches.

**FOR A FIFTH CAUSE OF ACTION AGAINST PAULOS, CORE CONCRETE AND CROFT**
**(Civil Conspiracy)**

41. Capital incorporates by reference each and every allegation contained in paragraphs 1 through 40 of this Complaint.

42. Defendants knowingly worked in concert to coordinate the terminations of their employment with Capital and to usurp Capital's trade secret and confidential information and to transfer that information to Core so Core could unfairly compete with Capital.

43. Core knew and intended that Defendant Paulos would provide it with the above confidential information which Core could then use to convert Capital customers and opportunities to Core's benefit.

44. Defendants have, therefore, collectively engaged in improper activity which would, or has, caused Capital special damage of having its trade secret customer lists to be stolen which is greater than that which would have occurred had they operated independently.

**SIXTH CLAIM FOR RELIEF AGAINST PAULOS, CORE, AND CROFT**
**(Federal Defend Trade Secrets Act)**

45. Capital incorporates the preceding paragraphs 1 through 44 as if fully set forth in this paragraph.

46. Upon information and belief, the individual Defendant's activities described above constitute actual or threatened misappropriation of Capital's confidential and proprietary business information, which constitute trade secrets as defined in the Defend Trade Secrets Act, codified under 18 U.S.C. § 1836, et seq., in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, et seq.

47. Defendants' actual or threatened misappropriation of trade secrets was malicious, willful, wanton, reckless, and done in complete disregard of Capital's rights thereto and with an intent to injure Capital and its business.

48. Capital's trade secrets are confidential and proprietary and derive independent economic value by not being generally known, or reasonably ascertainable through proper means, by competitors or others who can derive value from their disclosure or use.

49. Capital took reasonable measures under the circumstances to maintain the secrecy of all trade secrets.

50. Capital has been and will be damaged by Defendants' willful misappropriation of its trade secrets and/or threatened misappropriation of trade secrets and seeks actual damages.

**FOR A SEVENTH CAUSE OF ACTION FOR UNFAIR TRADE PRACTICE ACT VIOLATIONS AGAINST PAULOS, CORE CONCRETE AND CROFT**

51. Capital incorporates the preceding paragraphs 1 through 50 as if fully set forth in this paragraph.

52. The South Carolina Unfair Trade Practices Act, provides that "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." S.C. Code Ann. § 39–5–20(a). (Law Co-op 1976). A private remedy for violations of this Act is provided in § 39–5–140(a).

53. "Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of any unfair or deceptive method, act or practice declared unlawful by Section 39–5–20 may bring an action individually, but not in a representative capacity, to recover actual damages."

54. Defendants' actions in utilizing confidential and Trade Secret information concerning Capital's customers constitute unfair methods of competition.

55. The public interest is served in protecting such information and to assure that such methods of unfair competition do not result in one or more unscrupulous businesses driving competitors from the markets in which they do business.

56. These unlawful actions have the potential to be repeated and in fact have been.

57. Defendants have therefore committed unfair trade practices through the above-described conduct and Capital has been significantly damaged.

**FOR AN EIGHTH CAUSE OF ACTION FOR BREACH OF DUTY OF LOYALTY (AGAINST PAULOS)**

58. Capital incorporates the preceding paragraphs 1 through 57 as if fully set forth in this paragraph.

59. South Carlina employees owe a duty of loyalty toward their employers.

60. This duty of loyalty is breached when, as here, an employee acts against the employers' interest while still employed by removing confidential data for the purposes of using that data to compete in the future with a subsequent employer.

61. As a result of that breach, the employer is entitled to recover any compensation rendered to the employee during the period of disloyalty.

62. Paulos breached his duty of loyalty by stealing confidential and trade information and in seeking other employment during the time he should have devoted to Capital.

63. Paulos' actions went beyond simply making preparations as permitted by *Futch v. McCallister Towing.*

64. Paulos' actions constitute a breach of his duty of loyalty owed to Capital and have proximately damaged Capital.

**FOR A NINTH CAUSE OF ACTION FOR PERLIMINARY AND PERMANENT INJUNCTION**

65. Capital incorporates the preceding paragraphs 1 through 64 as if fully set forth in this paragraph.

66. Capital will be irreparably harmed if Defendants are allowed to continue their scheme to misappropriate Capital's trade secrets.

67. Capital has no adequate remedy at law.

68. The balance of equities is in Capital's favor.

69. The public interest favors enforcing laws and causes of action protecting trade secrets and preventing unfair competition in the marketplace and trade secret protection serves the public interest and promotes fair competition and without these protections irreparable harm will occur.

**WHEREFORE,** Plaintiff asks that the Court issue an Order:

1. Preliminarily and permanently enjoin Defendants and anyone acting in concert with them or at their direction from:

    a. Contacting directly or indirectly any current or former customer of Capital in an attempt to induce the current or former customer to enter into an agreement with defendant for purchase of concrete and related services.

    b. Contacting directly or indirectly any entity or customer which Capital has solicited in the eighteen (18) months following the end of his or her employment in an attempt to induce that entity to enter into an agreement with defendants.

    c. Inducing or attempting to induce any employee of Capital to discontinue or terminate his or her employment with Capital or to accept employment with another employer or entity; and

d. Disclosing or permitting the disclosure of any of Capital's trade secrets or other confidential and proprietary information and documents without the express written consent of Capital.

2. Directing Defendants and anyone acting in concert with them or at their direction to return all property of Capital in their possession, custody or control (including, but not limited to all customer lists, Daytimers, computer programs, forecasting models, business plans, financial information, equipment, computers, laptops, computer files, and any other property belong to Capital), as well as any copies of such material and property and any documents or files containing or prepared from or obtained or derived from Plaintiffs' property.

3. Granting judgment against Defendants for all actual damages suffered by Capital, including, without limitation, loss of customers, loss of sales and profits, loss of Capital's good name and goodwill, loss of use of its trade secrets, and for such other special and general damages as may be proved.

4. Granting judgment for all punitive damages for Defendants' willful and wanton conduct as are just, double exemplary damages as permitted by the South Carolina Trade Secrets Act and Defend Act, trebled damages pursuant to the South Carolina Unfair Trade Practices Act for its willful violations as well as the cost of litigation and attorney's fees as permitted by these Acts.

5. Granting such other relief, temporary and permanent, that the Court deems just and proper.

Lexington, South Carolina
May 15, 2025

**BLAND RICHTER, LLP**
*Attorneys for the Plaintiff*

*s/ Eric S. Bland*
Eric S. Bland (Federal Bar No. 5472)
105 West Main Street, Suite D
Lexington, South Carolina 29072
T: 803.256.9664 | F: 803.256.3056
ericbland@blandrichter.com

*s/Ronald L. Richter, Jr.*
Ronald L. Richter, Jr. (Federal Bar No. 6264)
*s/Scott M. Mongillo*
Scott M. Mongillo (federal Bar No. 7436)
Peoples Building
18 Broad Street, Mezzanine
Charleston, South Carolina 29401
T: 843.573.9900 | F: 843.573.0200
ronnie@blandrichter.com
scott@blandrichter.com

**MALONE, THOMPSON, & SUMMERS**

*s/ Charles F. Thompson, Jr.*
Charles F. Thompson, Jr. (Fed. ID Number 5969)
339 Heyward Street
Columbia, SC 29201
(803) 254-3300
thompson@mtsolawfirm.com